Good morning, and may it please the Court, my name is Mac Lacy, and I appear on behalf of the Plaintiff's Appellants, the Oregon Natural Desert Association, and Western Watersheds Project. With me at counsel table is David Becker, co-counsel in this case. I'll police myself, and I'll try to reserve two minutes of my time for rebuttal. This case is about ongoing livestock grazing that is causing damage within the heart of one of just two remaining habitat strongholds for the greater sage-grouse. There are three issues raised in the briefs. There's mootness, there's the question of the merits of the NEPA claim, and finally, there's the question of remedy. With the Court's permission, I'd like to begin with the threshold issue of mootness this morning. There are scores of cases in which this Court has found live controversies in environmental cases, even after the contested agency action has been completed. And the common thread in these cases, as this Court has explained, is that the violation complained of may have caused continuing harm, and that this Court can still act to remedy such harm by limiting its future adverse effects. In the case now before the Court, BLM is trying to make new law under which an agency could purport to make a new, superseding decision at the 11th hour, all the while carrying on the ground-discurbing action that caused and continues to cause damage. And that's a new extension that goes well beyond the precedent that this Court has set with respect to mootness in the context of NEPA. Maybe I could ask you a couple of questions so I make sure I have my facts correct. It's my understanding that as we began this case, or what's happened in this particular case, there was an action in 2002 where the Court generally determined at that point in time the grazing standards that are still applicable even today, correct? There was an early separate litigation filed in the district court at that time. Well, you're not answering my question. It's my understanding that the grazing standards that were produced or that were suggested in that particular action in the court were set. Nobody challenged them. And that's what we go back to every time when we can't decide what to do with grazing. We go back to the original district court action. Well, the original case isn't relevant to this case. Let me try to ---- Well, let me ask you, what are the differences between the grazing standards that the Court set then and the grazing standards that are in effect now? Well, what the Court was looking at in the earlier case, which is not the district court case that led to the appeal today, was BLM's initial attempt to make changes which were required under the federal rangeland health regulations, and specifically the provision that requires the agency to make changes prior to the start of the next grazing year. And that was what the district court was looking at in that earlier case, the so-called first iteration of the interim strategy. And it's important to note that that was a case brought under the Federal Land Policy and Management Act, or FLPMA in acronyms speak. And the question there was whether the changes were going to achieve significant progress, which, again, is what is required under those regulations. The Court found at that time, as of the year 2004 when it issued its decision, that what BLM had done was okay. And never challenged? Well, ONDA, one of the plaintiffs, well, actually both plaintiffs, ONDA and WWP challenged it. But lost. But lost that case. Right. Never appealed. That's correct, Your Honor. And the standards set in that case are the ones we just keep going back to every time that BLM comes up with a new standard and somebody challenges it, we go back to the standards that were set in that case, as I understand it. With respect, that's not quite right, Your Honor. Standards have changed. I understand that we've had some other things happen, trying to do repair work, if you will, and all other kinds of things. But as to the grazing itself, what has changed? Because I understood before the district court you even represented that things were the same as they were as to the grazing standards in 2002. Well, the interim strategy, the first thing we should make clear is that the interim strategy only sets out dates for grazing. But there are a lot of different standards or terms and conditions that make up a grazing permit. So there's not just the dates that the cows are out there. There are utilization standards for percentages of vegetation that can be consumed, those sorts of things. But I think the key to answer your question or your concern, Judge Smith, is that the operative instrument that allows cattle to enter these public lands is the 10-year grazing term permit. So this whole discussion of the interim strategy or strategies is a bit of a red herring. It's a side issue because the cattle can't be out there today unless the Bureau of Land Management has issued or has made a decision to issue a 10-year term grazing permit. And there's only one decision in which BLM did that, and that's the March 2010 decision, the one that the plaintiffs have challenged in this case. Now, is that, substantively, that permit, is that the same terms as were in the 2002 lawsuit in terms of, or is this only with regard to, are you suggesting that it is with regard to dates but not with regard to other terms, or are you suggesting that it was just, even in March 2010, was only temporary and that there was going to be something else, or what? No, it's different terms and conditions, Your Honor, and it wasn't temporary. It's, as I said, a 10-year permit, so it's the permit. It's the threshold legal instrument that needed to be issued. Does it give grazing rights every year for 10 years, or can those be revoked or pulled back by BLM on a yearly basis? BLM has the authority to modify term permits, but the typical practice is that a permit is issued in year one, let's say, and then the agency uses annual decisions if it wants to tweak things like dates, maybe tell the cows to go out two weeks later this year or change the state. Could it pull back the permit completely in year two? Could it sign the contract in year one and in year two say, we're not going to let you do it anymore? Well, only if the agency goes through a full NEPA process and issues a new, challengeable decision, and, in fact, that's what happened in this case because the original grazing, back when this first unrelated case was happening, that grazing was occurring under permits that were issued for a term that went from the year 2000 to 2009. But as I understand the 2010, and, again, I guess I'm back on the same, as I understand in December 2010, any decision as to the grazing itself was rescinded. We went back to the interim strategy of the 2002-2004 court decision, and we said we're not doing anything on that because BLM has new things they want to take into effect. And, again, in February, the BLM's 2010 decisions. There's a disconnect between what the agency is saying in its briefs and what the actual December 2010 document says because the December 2010 document only says that BLM is withdrawing or rescinding the part of the March 2010 decision that was allowing further project construction. Everything else, the remaining portions, is the language that BLM used, BLM left in place. And everything else, the remaining portions from the March 2010 decision, with respect to grazing means the 10-year term permit. And, again, without that permit, cattle could not be out there last year in 2010, and cattle cannot be out there today. But they are because BLM expressly left in place the March 2010. You said that there's a 10-year permit, but there are annual renewals on it. Annual decisions. The agency has that. Was there a 2011 decision about grazing? I'm sorry. Was there a 2011 decision about grazing? Yes. That's not in the record because the record cuts off before then, but there are examples of prior annual decisions. And this particular BLM district uses billing statements which are sent to the permittees, and the permittees sign off on whatever is in that annual decision. So what was the substance of the March 2010 decision with regard to grazing that has continuing effect and that you're complaining about specifically? Specifically, it begins with the issuance of the permit, and the permit contains terms and conditions. And so the terms and conditions include dates under which the cows can be out there, March 2010 decisions authorized construction or retention. Construction is off the table, though, as I understand it, no? Right, right. The March 2010 decisions authorized further construction. But you're correct that that's off the table. I want to know is what of the March 2010 decision. That's right. With regard to grazing, is not, has continuing impact over the 10-year period and isn't subject to reconsideration each year with regard to the annual renewals? I'm sorry. Are you asking whether it is subject to reconsideration this year, 2011? Yeah. I mean, what I'm asking is if they said something specifically. Give me an example of something that you are challenging, which was in the March 2010 decision, and which was the subject of the NEPA consideration then, which has continuing impact. Just give me now, in October of 2011. Well, the cows have consumed 37 million pounds of forage or vegetation this year. That happened in 2011. Well, it's still happening right now, but I assume that they've consumed the better part of those. And they can only do that because of the permit issued in March 2010 and the consideration, the substantive detailed consideration that went on in March 2010. That is correct, because only the permit names how much, what the AUM level is, the annual unit, animal unit months, which is this amount of forage. The permit is the only legal instrument that provides that number that allows. Annual renewals. No. The annual renewals don't touch that. And these interim strategies, all they touch are the dates. But the amount of vegetation that has been allowed to be consumed within sage-grouse habitat is set by the permits and the permits only. Right. Obviously, we have a disconnect between the parties as to this, and we have to hear what government has to say. But assuming you're right and assuming that part, if it's not moved, what do we do next? Well, I think the next question is to turn to the NEPA, the merits on NEPA. And then if we get beyond that ---- The district court didn't address, so why don't we just remand it if they agree with you? Well, BLM made a strategic decision before the district court not to address NEPA on the merits. They sprinkled in some arguments. That's what happens when you make a motion for summary judgment, right? You make a motion for summary judgment on whatever you make it, and if they agree with you, they agree with you. If the district court agrees with you, you don't have to argue everything else. That would not be very efficient. Well, I think if they had filed a motion to dismiss, it might have made sense not to address the merits. But ONDA filed an opening summary judgment brief. BLM filed a ---- I don't see what difference that makes. I'm sorry? I don't see what difference that makes. Well, and BLM filed a summary judgment brief of its own and opposing ONDA's, so it had to respond to the aspects of our claim under which we moved for summary judgment. But I think to move the second answer to your question, Your Honor, is this Court is reviewing this case de novo, and this panel has everything before it which the district judge did and would on remand. Right. And we probably could do it, but we usually don't. Well, the record here I submit is compelling. It's clear. It's complete. The scope and magnitude of the new information that came forward is astonishing, really. It was a sea change in terms of the way that federal, state, university, other experts and leading scientists were thinking about sage-grouse and how things like livestock grazing and water developments and West Nile virus and mortality from flying into barbed wire fences, how all of these things impact the sage-grouse in ways that were truly not understood or not recognized at this scope before. And the record makes that abundantly clear. And this, for no other reason than for judicial economy on de novo review, I would submit that this Court has all of the information before it it needs to. Let's talk about economy for a minute. Let's say that we do think it needs another look, but that in December there was another look given by the Bureau. If we were to remand, should we remand for review of not only the March plan but also the December plan or maybe even more specifically just the December plan as incorporated part of the March plan? Well, I think what the Bureau of Land Management needs to look at in a supplemental environmental analysis or, as we argue in an EIS, is the impact of livestock grazing and continued use of these projects on the landscape. Isn't that what they say they're going to do? Isn't that what they say they're about to do? Well, the BLM has said that it will undertake some further NEPA review, but it hasn't said when or, you know, most troubling what level of review. And they've been saying that for some time. Yes. And it's a shell game. I mean, the buck has to stop somewhere. But talking about buck stopping and new information, what would be your position if we were to remand, but remand for consideration not only of the March 2010 decision but also the December 2010 position? Because that would get into the administrative record, the monograph and the Fish and Wild Services Declaration of Potential Endangered Species and the West Nile virus. It would get all that information into the record. It's already in the record, Your Honor. But it was not considered in the March decision. It was in the December one. Is there anything wrong if we remanded to remand for consideration not just of the record as it existed in March but to remand for the record as it existed through December? Well, it was considered but rejected in the March 2010 decision. Can I just get a yes or no answer? If we remand, I know you don't want us to, if we do remand, what would be your position if the remand was for consideration of both the March 2010 decisions as incorporated or not incorporated or extended or not extended, as modified or not modified by December 2010? Yes, insofar as that type of remand would be. You would not be opposed to that? Well, I don't think that it's the ideal result, and it's not what we're asking for. But to explain my yes answer, it would be the reason would be because the great, if BLM wants to graze at all in Louse Canyon going forward, if BLM wants to continue to use, extract water at all, continue to use barbed wire fences at all, then BLM needs to take a hard look in an EIS at the impacts to the sage fence. In fact, there was no 2010 decision, or maybe I'm confused. I thought the 2010 decision was to withdraw the decision and say we're going to do something in the future that we haven't done yet. You're referring to the December 2010 decision. Right. In other words, what was the 2010, December 2010 decision? Well, the only thing of substance in that December 2010 decision was not to build anymore. That's correct. Nothing about grazing, and also it remained silent in terms of continuing to use the already built fences and artificial water developments. So the real decision, the one that's going to finally deal with this, hasn't happened. I'm sorry, Your Honor. The decision that's finally going to take into account the new monograph hasn't, doesn't exist yet. Well, in March of 2010, BLM prepared the supplement document, which is not a formal supplement. But it's now saying they're going to do something else, but they haven't done it yet. Right. In the supplement, BLM explained that we did look at the monograph and the Fish and Wildlife Service determination. But it is a little stupid to be reviewing that because they've now, where they said in March of 2010, we're not, we don't think this matters in December of 2010. They said, well, scratch that, maybe it does matter. I think that's exactly right, Judge Prezone. So what are we reviewing? What are you, the panel? Well, what would, what would be dealt with if, I mean, if the argument is, well, in March 2010, you said this didn't matter. So that was arbitrary and capricious. I assume the government would say, well, yes, you're right. Now we're saying maybe it does matter. So we're no longer saying it doesn't matter. So there's no reason to reverse us on that. We've already said maybe it does matter. I think this highlights the absurdity of the factual situation, which the complaint of action and harm is continuing. But the agency is asking for continued chances to go back and take yet another look. And I do see I'm running low on time that I wish to reserve. Okay. Thank you very much. Thank you. I'll give you some, two minutes more, panel. May it please the Court. Katherine Barton for the United States. And with me at council table is Michael Schessler of Interior's Regional Solicitor's Office. So I'd like to just highlight the three points I'm going to make in my argument to start. First is that the district court correctly held the case was moot because the December 2010 decision supersedes and provides the authority for grazing now on the LCGMA, so that the March 2010 decision doesn't have any effect. Second is that if there's anything, if the court feels like there's anything left from the March decisions, obviously the question is what, the thing that's left is the interim grazing strategy that's continued since 2002. But ONDA has not challenged the interim grazing strategy. Their summary judgment brief was totally briefed the changes to grazing by the new plan, not the continuance of the interim strategy. So at a minimum, there has to be a remand. That issue wasn't presented in summary judgment and wasn't, BLM might have addressed that issue because that's not really what it's planning to look at going forward, right? I mean, it will, as part of its whole overall process. But what it was looking at was, you know, the new information pertaining to the changes, which is what their declarations and all are based on. And third is that certainly the court should not get to the question of injunctive relief. But again, if it did, there is no irreparable harm. The interim grazing strategy is less grazing than there has historically been on the LCGMA for a century or more, with water projects there and 280 miles of fence, which is now increased to 300 miles by the 20 miles that are at issue in this case. And the greater sage-grouse has a stable or increasing population in that area. So those are the highlights of my points. And I can start with mootness now, if the court would like. So the December 2010 decisions were done through the process for any kind of grazing decision, full decisions with notice and comment and protests. And they decided to revoke the new plan that was set forth in the March 2010 decisions and to reaffirm the other portions of the decisions which allowed grazing to continue under the interim strategy. And they provided that there wouldn't be a change. I'm not talking about interim strategy. We're talking about the 2002 interim strategy.  That's existed since 2002. They didn't grant new grazing permits. They said those were granted in June or in March, rather, and we're not going to change those. Isn't that right? It said it's right. It didn't make changes to the permits. It made changes to the grazing authorization. But you can't do L. It didn't physically change those permits, but it said that the new projects cannot be built and the grazing based on those new projects can't be built. Right. The new projects can't be. But the 10-year extended lease that was done in March of 2010, we affirm that. We don't change that. Right. That's correct. Right. So that is a continuing effect of the March order. Well, it's a new decision. For example, when the March decision actually the March 2010 decision kept all the same grazing schedules from the March from the 2005 decisions, but nobody says. It might have continued. The earlier one doesn't negate the fact that it had to come up for a 10-year renewal. In March, it was renewed. In December, they said we're not reexamining that. They reexamined and reaffirmed. I mean, they didn't reexamine. They said it's a new decision in which they said. This is the hardest part of our case. I agree. That can't be the answer because insofar as there was any environmental consideration of that, it wasn't March. Any environmental? Environmental consideration of that decision. Yes. It wasn't March. So if they can't review that, then you can't review it at all. I mean, you can't simply. If you could do that, you could do it every six months. You could say every six months we're washing out the last one we said. Right. We're now going to say the same thing again so you can't review the old one, and we're not going to give you any new environmental consideration because we did it before, because that's really what you're saying. That can't be. No. I mean, I agree. I think the court. There's no sham going on here, right? The BLM gave on to what it understood it to be asking for, which was retraction of the decision and it's going to consider the new information. And, in fact, probably it's certainly possible, I shouldn't overstate, that the decisions will be different or at least the proposed action may be different because the money that was coming from the state of Oregon for the improvements is gone and BLM is redoing the resource management plan under a settlement with ONDA that was incorporated in a decision by this court, and BLM has issued a national planning strategy for the sage grasses. Let me switch to another question. Is there, I mean, Simpson, and I know about that other case. That was the wilderness case, is that right? I'm sorry, which case? Was that the wilderness, the case about wilderness values? Was that the one? The one that was at issue during this case, Rasmussen? The one that was settled. Oh, yes. ONDA versus BLM, I think. Okay. Is there any point to us sending this to the arbitrator, to the mediators who were very helpful as to that, I think, and trying to settle this? I mean, we're down to a very small argument here, it seems to me. Right. Is there any way that our mediators could help out in getting this show on the road so that in the end there is an actual decision about an actual order, which is what I gather everybody wants instead of fighting about the past? I don't know, Your Honor. I mean, BLM is going forward and doing what ONDA asked for. And BLM doesn't consider it has the legal authority to stop grazing on the, you know, to make a decision to halt grazing on a multiple-use area. And, of course, that wouldn't maintain the status quo. Stopping grazing would be a huge change to an area that's been grazed even historically by bison and antelope, which co-evolved with the sage-grouse. So that would be a huge, you know, those kinds of decisions aren't something that I think they're willing to consider, if there was some little thing about the projects, perhaps. But the projects seem so minor here. I mean, 20 miles of fence on a place that already has 280 miles, and that they're going to consider whether to take out. They just decided not to use public money to take them down and not to cause the ground disturbance while they're figuring out what they should do. The agency is trying to do the right thing. I'm not sure what else it could do at this point. It's retracted everything except the ongoing grazing under a strategy that was less grazing than had been done before this all started. And the only thing from the March 2010 decision that has any effect at all is that interim grazing strategy in the March in the 2002 court decision has now been made a 10-year strategy? Well, it's been made a strategy until they complete a new process looking at the new. So it isn't even 10-year. It's just until we come up with a new strategy, which we've then thrown out every other strategy that there is, it's just that they have permits out there that are for 10 years. Right, right. And the fact is, I mean, as a practical matter, too, Congress has provided that for annual appropriations writers that provide grazing to keep on going under preexisting permits if NEPA compliance hasn't been achieved. So the status quo under congressional action has been that grazing continues. Was that mentioned anywhere in the briefs? No, I mean, it's not. I'm not trying to make it as a legal argument. Well, it seems like a legal argument. I mean, if nothing we do here is going to make a difference because Congress has said that the grazing is going to continue under the prior permits no matter what happens, then why are we here? Well, we could look at that. It's an annual – usually it's an annual writer. I mean, we never know what Congress is going to do. I see. But it's in effect now. I think that they've – I think it's on the continuing resolution. I'm not quite sure. I have it. We didn't brief that, and I don't want to mislead the court in any way. I'm just saying this has been the practice of Congress not – you know, this process for NEPA, once this rangeland health evaluation that got this all started was put in place, it started making a more robust NEPA process, and that's what sort of caused Congress since 2004 to have these writers, so that while they're trying to come into compliance, grazing can't. But one thing that – one of my questions is the 2002 strategy was an assertively interim strategy. Right. So, I mean, that's the one problem with continuing it ad infinitum, which is that it was not supposed – I mean, it wasn't approved ad infinitum to begin with. It wasn't evaluated ad infinitum. Right. I mean, it was an improvement over the existing situation, right, to protect the riparian areas. But, no, because of the nature of this case – I mean, the case has gone on for a long time, again, because BLM tried to do the right thing in, you know, conducting after there was a decision by the district court in a different case that indicated they might have to, as this court eventually decided, look at wilderness areas, you know, that had not been officially part of the study. They went ahead and did that in this case, and that's why it sat around for a while is that BLM completed that and then came out with the March 23 decision. But all that means is that the fact that the interim strategy was approved in 2000 or 2002 or whenever doesn't really answer the question of whether the environmental issues related to the interim strategy as they were incorporated in the March 2010 permit are kind of resolved, because it was an assertively interim strategy to begin with and one which presumably could have different environmental impacts over time, depending on how the environment is developing in the meanwhile. No, I mean, I agree, and that will be one thing. But, I mean, ONDA has never – ONDA didn't ever attack the interim strategy, right? It was always even, like I said in its summary judgment briefing, if you just can look at the first paragraph summary where it's just all about the changes in grazing that was going to occur that's been the basis of their briefing. But then it seems to me you're conceding that the case is moot, that the question of the March – well, let me – maybe you're saying the case is moot because they weren't actually ever challenging the interim or not. We do have a practical argument. But the March 2010 order itself isn't moot. If this Court thinks that a reaffirmance of the interim strategy and allowance of grazing doesn't constitute enough of a new decision, even though it was incorporated in – But the reasons I just suggested, it seems to me it has to. I mean, because the environment doesn't stay static. And not only that, the order was – the original order wasn't meant to be permanent. It was meant to be interim. So the decision in March 2010 to continue it, it seems to me – Right, right. Let me just put it this way. It would have been reviewable had it been – had there been a petition for review to review it. Is that right? If somebody had filed a petition in March – in April 2010 and said, I want review of the part of the March 2010 decision that says you're going to continue the interim grazing unless X, Y, and Z, they could have done that. Well, you mean – which basically ONDA did by amending its complaint. But you're saying – you seem to be saying they didn't really do that. Because they were never actually – Right. So we have a very practical problem then. You're not really saying that the March 2010 order is moot in the sense that somebody couldn't be asking to review it. You're saying they weren't. Well, yeah. I mean, we did argue in our brief that the new decision, reaffirming and incorporating, still mooted it out. But I understand the Court's point. And on that point, it's true that if you look at it that way, it has continuing effect. And then our argument is either that they have basically waived the challenge to the interim strategy or there needs to be a remand on the merits because it hasn't been briefed on the merits and it isn't in their declarations, you know, as the basis for the harm that they identify. If we – sorry. Go ahead. You go ahead. And, in fact, the March 30, 2010 decision didn't say anything about the interim strategy. Right. It says to new grazing regulations. And those new grazing regulations are now defunct. Right. Because the BLM went back to something that wasn't even in the strategy. So there's no – there was no, if you will, fight with the interim strategy in the March 30, 2010 decision. That wasn't even on the table. Well, there was no – right. It hasn't been the basis for challenges. It isn't the basis on which, you know – anyway, that's correct. But it is true also that that – that the March decisions extended the permits for 10 years. If we remanded, could we and should we remand for consideration both of the March 2010 decision and the December 2010 decision as to whether an environmental assessment is needed? No. This is the issue. They could amend their complaint. They could have amended their complaint. They could bring a challenge against the December 2010 decisions. And they just haven't done it. They could have done it right then. We could have had new summary judgment briefing. And we wouldn't have to be before this court right now. But they didn't amend their complaint. So there's no way that we can get the December 2010 decision now before you. No. It's not before the court. It's done. It's not before the court. It wasn't even – actually, the final decision wasn't in the district court record. If we were to remand, we could not remand for consideration of the December as well as the March decision. That's correct. So all we could do would be to say we think that the March decision was defective for an environmental assessment. You should say that the case is moot and you remand to the district court to determine how to proceed. That's your argument. It's not moot. I'm sorry. It's not moot. It's not moot. Right. And I don't think the merits are properly before this court. Yeah, that's what I meant to say. And then ONDA could decide if it wants to amend its complaint and bring the December 2010 decisions. Can you still do that? If this court remands, I mean, I guess the district court will have to decide whether they waived that. I thought the district court refused to allow that. I'm sorry. I mean, isn't part of the reason we're here because the district court refused to allow that? No. No? No. I thought that you or somebody asked the district court. We suggested he might allow them, but they didn't ask. But I thought he said I wouldn't do it. I thought the district court said, no, I'm not going to do it. No, we asked for a stay and voluntary remand rather than get into this situation with the decisions. BLM said, oh, well, okay, we want to, you know, we want to look at this. So that's what the district court indicated it wouldn't do. I see. No, they haven't. I don't know why. Presumably because the case has gone on forever. That's presumably why. I'm sorry. Presumably because the case has gone on forever. Yes. I believe that probably is the reason why. If it would be helpful, I could continue on about the injunctive relief or I should any questions? Okay. Thank you very much. This all sounds sort of like a tempest in a teapot. Could you tell us why it isn't? It sounds like what? I'm sorry. Tempest in a teapot. A tempest in a teapot. Yes. Well, I need to address the interim strategy. Because that, with all respect to opposing counsel, that is really so in confusion here. There are two completely separate interim strategies. The one issued in 2002 is completely separate from the March 2010 one. And at the reply brief at pages 5 and 6, I tried to explain that to the court. The 2002 one is at SER 7. The 2010 one is at ER 291. Completely different dates. Completely different pastures. Because certain pastures didn't even exist back in 2002 because BLM hadn't yet built the fences. So the interim strategy is really a sideshow here. Because the only legal instrument that allows cows to enter these public lands is the underlying 10-year permit. The other point I want to ---- Judge Smith suggested that, and I don't ---- I assume he's right, that there's nothing in the March 2010 order that actually addresses the interim strategy. Well, an interim strategy ---- Is that right? Is that correct? Well, not quite. Because an interim strategy does exist in the March 2010 decision. And that's at ER ---- But it isn't the 2002 interim strategy. It's not. ER 291 ---- They went back to the 2002 interim strategy because they threw out all of the things that they were going to say in the March, even long-term or interim, went back to the strategy which had already been put in place. Well, BLM couldn't go back to the 2002 strategy because the 2002 strategy, the document itself at SDR 7, refers to pastures that don't even exist anymore. So it's a meaningless piece of paper today. That's why the so-called interim strategy at ER 291, which was part of the March 2010 decision, is something different. So you're saying that there was a decision in March 2010 that adopted an interim strategy, which you could review now. Yes. The interim strategy is one, just one, of the many terms and conditions of the permits issued in March 2010. But at this point, that strategy is not even being enforced by BLM. Nor is it being put to use by BLM. That's not true, Your Honor, because it's the March 2010 interim strategy which BLM defaulted to. It's not the 2002 strategy because, as I pointed out, those pastures don't even exist. So it's the document at 291 that controls the dates that cows are out there today. Okay. Other issue, as I understand it, is there is an argument that you ---- that may be, but you didn't challenge that. So in that sense, as I understood, the most reticulated form of her argument is that even if there was something that could be challenged with regard to the March 2010 order, you haven't challenged it. Therefore, the lawsuit is moved, whether or not the ---- even if there is some life in the March 2010 order. What about that? I agree that a plaintiff could challenge the December 2010 decision as final agency action. However, the March 2010 decision also, under Section 7062A of the Administrative Procedure Act, is final agency action. But the question is, if the only issues that you raised with regard to the March 2010 order in your complaint and in your briefs don't have to do with what's survived of it, then why isn't the lawsuit moved, even if the ---- there is a surviving part of the order? Well, the premise is wrong there, because what ---- That's what I'm trying to find out. Okay. What survives is that grazing cows are authorized and only by that March decision. I understand that. I agreed with that. That was my premise. My question is, has this lawsuit sought review of the aspect of the March 2010 order that's revived? To the extent that grazing is continuing and that water is ---- Under it. Under the permits. Under the permits and the default insurance rules. Correct. So grazing, use of the water, water-extracting devices, and the use of the barbed wire fences. Those three things were ---- Use of them. But you're not seeking to remove them now, are you? Well, we're seeking to have the water turned off at the pumps and to have the fences taken down until BLM completes a law ---- I'm going to try a third time to ask what Judge Bregon said and see if I'll be more successful. Did you challenge the extension of those grazing permits in the March 2010 evaluation? Yes. And why did you challenge them, and what did you argue about it? That is the amended complaint, a single claim under NEPA, claiming that BLM violated NEPA because it should have supplemented its analysis and because it should have prepared an EIS. Specifically for the extension of the grazing rights, unrelated to the water or anything else? Yes, although all three of the aspects, grazing, water, and fences, are part of the March 2010 ---- Do you disagree then with the opponent here when she said that you didn't challenge those leases? Yes, I disagree with that because that's what the March 2010 decisions did. And I am over time ---- But that's not the question. The question isn't what the March 2010 decisions did. The question is what your lawsuit did. What was your lawsuit challenging? What were you raising in your lawsuit? The adoption of those decisions in violation of NEPA. Anything in it? The adoption ---- Anything and everything in the March 2010 order? Well, specifically authorization of grazing and continued use of water and fencing and that decision taken in violation of NEPA. If there are no further questions, thank you. Thank you very, very much. Thank you all for your arguments. And we ---- the case of Argonne National Desert Association is submitted and we are in recess. Thank you very much.
judges: Ebel, Berzon, Smith